LEAR, Judge.
This matter is before us on remand from the Supreme Court to articulate the factual conclusions and evidentiary basis for our prior decision affirming the judgment of the trial court.
This cause arose out of a two car collision on Highway 51 in the Parish of Tangipahoa. Appellant, Ray H. Lewis, filed suit in tort against defendants, Elias Sandel, Jimmy Hammer and Troy E. Sandel and his uninsured motorist carrier, Toledo National Insurance Company. In his suit, he alleged that these defendants were liable in solido to redress plaintiff’s damages.
Plaintiff alleged that defendants Troy Sandel and Jimmy Hammer had created a dangerous situation on the roadway when, after their cars collided and obstructed passage by other cars upon the highway, they failed to give warning to other motorists of the danger created thereby. Defendant Elias Sandel was sued as owner of the vehicle.
At the trial of the case, Toledo National Insurance Company (whose name was later changed to Credit General Insurance Company) filed an answer and third party demand, naming Hammer and the Sandels as defendants.
The only testimony offered by plaintiff on the issue of liability was his own. He testified in substance that he was proceeding north on Highway 51 between 11:00 and 11:30 p. m. when he encountered an oncoming vehicle whose driver asked “. . . for his light .. . . ” By his testimony, Lewis interpreted the blinking lights on the other vehicle as a request that he dim his own, with which he complied. He also stated that he slowed his vehicle:
“Q. You dimmed your lights?
A. I dimmed my lights. I was creeping along there, so I got right up on this other car cross ways the road on me, and so when I put on my brakes I pulled my brakes and my car kind of slid . . . and so when I did there when my car hit the other car and my chest hit against the steering wheel . . . and my head went through the steering wheel. It knocked me out. I stayed in the car a little while, then I got out and staggered to the other car and I looked. I didn’t see nobody, and wasn’t no lights on.
Q. Did anybody say anything to you?
A. Nobody said nothing to me.
Q. What did you do?
A. I staggered back to the car and I looked, and I went back to the car and stood up on side of the car shaking my head, and I got back
*364 Defendants’ version of the incident was materially different. Troy Sandel testified, and his testimony was corroborated by that of his sister, Cynthia Sandel, who was a passenger in his car.
In substance, their testimony was to the effect that they too were proceeding north when they were confronted by a sudden emergency. A southbound vehicle being driven by Jimmy Hammer was forced into their lane while attempting to avoid hitting a vehicle in front of them. When this happened, the southbound vehicle ended up in defendants’ lane of travel, causing a collision involving defendants’ car and that of Jimmy Hammer. Shortly after this collision, plaintiff proceeded northbound until he was confronted by this situation on the roadway. Troy Sandel testified as follows:
“[BY MR. PALMER:]
Q. You have heard the testimony of Mr. Ray Lewis as to what he saw and did on the night of the accident, could you state in your own words what happened that night?
[TROY SANDEL:]
A. What happened is I was . . me and my sister . . were coming from Hammond, and we had passed through Independence. This was South of Amite .. Iam not sure exactly how far South. There was a light rain. I was driving about 48 miles per hour, and a car changed lanes ahead of me .. it had been going South .. a car in front of him slowed down, he put on his brakes real quick, and spun around and landed in my lane, so that’s how the original collision happened. We were there in that position, with the two cars more or less joined together, blocking the northbound lane. The southbound lane was open, and...
BY MR. PALMER:
Q. At this point I would like to interject one question. There has been testimony by Mr. Lewis that a car came by and asked him to dim his lights . . in other words blinked . . right before the collision. Do you have any recollection of a car coming and blinking?
BY THE COURT: Strike the editorialization of the question when another car coming asked the other vehicle to blink his lights.
BY MR. PALMER: Your Honor I was quoting from him. He said he asked me ..
BY THE COURT: Proceed.
WITNESS:
A. I don’t remember seeing any other car. What we did at the time his car came, both cars had their blinkers on ... we had put our safety blinkers on . . my sister was sitting in my car, which was actually owned by my brother .. was sitting in my car holding the flasher on, so the flashers were on, and in addition we had a door open ... I don’t remember which one, but the lights were on inside the car, and it was a white car . . and then as the car got closer I stood in front and waved ....
BY MR. O’BRIEN: Excuse me. What car sir?
A. Mr. Lewis’ car . . . got closer to the scene where the original collision had taken place, I stood in front of the car and waved until I realized that I was going to die if I didn’t move, so I moved out of the way and I saw inside our care (sic) . . which was lit up .. I saw the ear at the time it was hit, and it was still lit up inside then.
BY MR. PALMER:
Q. Were the doors open on your car . . . I didn’t catch that?
A. At least one was, because the inside of our car was lit. I could see clearly inside.
Q. What color was your car?
A. White.
Q. How much time had elapsed, had anyone else taken notice of this accident before Mr. Lewis came on the scene?
*365 A. At least I think ... I don’t remember too well, but I think there were at least a couple of cars had stopped by then, and someone had gone to call the police . .. not as many ass later stopped, but ...
Q. Did they have their lights on, or do you remember?
A. I don’t really remember. I think some of them may have already started trying to driect (sic) traffic and use flashlights and things. I know I didn’t have a flashlight, I was just out in front of the car waving.
Q. You said you would die if yoü didn’t get out of the way and you jumped to the side of the road, and what happened?
A. I jumped off to the shoulder and looked back, and then I saw Mr. Lewis’ car hit ours with my sister inside . .. and more or less crumpled the thing up like a piece of waste paper. It was a pretty hard lick.
Q. Then what did Mr. Lewis do?
A. He got out and looked at the car, and then ...
Q. When you say the car you mean . . .
A. At both of them, at the place where they came together, and then he got back in. I believe he had some trouble trying to get the car loose. I believe maybe the bumpers were locked . .. they were hung together some way . . so he began trying to get them loose. Basically the last thing I remember is that he left.
Q. He was able to pull his car away?
A. Finally ... it took awhile.”
Cynthia’s Sandel’s testimony was fully corroborative of her brother’s statement and which seemed to explain the context of plaintiff Lewis’ testimony that an oncoming driver asked “... for his light .... ”
“[BY MR. PALMER:]
Q. I’m particularly interested in the second accident. You were involved in one where another car came into your lane and struck your vehicle, is that correct?
[CYNTHIA SANDEL:]
A. We struck his vehicle because it came into our lane.
Q. Was that a severe accident?
A. No, very, very mild.
Q. Following that accident what did you do?
A. O.K. the car we were in was relatively old, it was a white car, and . . I don’t know maybe the flasher we could have turned it in such a way it would have stayed on, but we couldn’t figure out exactly how to do it so I said I will just sit in the car and hold the flasher on. The left front door, the driver’s door, was open, because my brother had gotten out to go see if the other guy was o.k. To make sure everybody was all right, and I was sitting in the car holding the flasher on.
Q. Were the flashers working?
A. Yeah. You could see them. It was dark enough outside to where you could see if something was flashing.
Q. You could see them coming on and off?
A. Right, you could see them flashing.
Q. Was the dome light on in your car?
A. The overhead light?
Q. Correct.
A. Right.
Q. The other car that was involved in the first accident, were it’s (sic) flashers on?
A. Yes.
Q. Do you recall whether the headlights of either your car, or the other car, were on?
A. I don’t recall. I couldn’t say one way or the other.
Q. Were your headlights and the other car headlights on before the accident occurred?
A. Yes.
Q. Do you recall having turned your lights on or off, or having them turned off by someone else?
*366 A. I honestly don’t know. I don’t know that the headlights would have been on or I probably would not have been able to see the flashers flashing.
Q. Did your brother get out of the car?
A. Yes.
Q. Were you at anytime aware of an oncoming vehicle in your northbound lane, specifically the vehicle owned and driven by Mr. Ray Lewis?
A. Well I was holding the flasher on, and the direction that his car would have been coming was probably over my left shoulder . . . slightly over my left shoulder .. and I was holding the flasher on, and there was some people had stopped to help . . . there was a man who had stopped, and a couple who were dressed up. They were on their was going somewhere, I don’t know where, and I heard a woman scream. I looked up and saw the headlights coming. Then I just blacked out.
Q. You were in the car when it was struck?
A. Right.
Q. There were other cars that had stopped at the scene of the accident?
A. There were at least two, and I couldn’t say if there were anymore than that .. . but at least two.
Q. Do you know which side of the road they were parked on?
A. One car had parked on the shoulder on our side of the road.
Q. Was he in front of your car, or behind you?
A. He would have been in front of the other car that we had hit.
Q. All right ...
A. .. And the other car was on the other side of the road, on the shoulder, pretty much in the same position we were ... same area, but on the shoulder.
Q. Did either one of those cars have lights or flashers on?
A. No, the guy on the other side of the road, parked on the shoulder, had a high beam flashlight . . but I don’t honestly recall whether he had his lights on or not.
Q. What was he doing with the high beam flashlight?
A. Well he wasn’t doing anything yet, but he was just kind of ... I think they were getting ready to wave traffic around, but like I said the accident had just happened, and I don’t think anyone was prepared for another car coming that soon.
Q. Did the fellow with the high beam flashlight get out of his car with the flashlight?
A. Right.”
The only other witness called by defendants was the investigating officer. He was unable to recall, independently, any substantial details of the accident, but, using his report, he testified that Lewis was not present at the scene when he arrived; that he, therefore, characterized the accident at that time as a “hit and run.” The only testimony given by the officer which bore materially on the question of liability was his recollection that the roadway at the scene of the accident was “straight and level.”
Jimmy Hammer, the defendant-driver of the vehicle which first collided with the Sandel vehicle, did not answer the lawsuit nor did he make any appearance. Plaintiff sought to confirm a preliminary default against him.
The trial court found that plaintiff had failed to sustain the burden of proof by preponderance; that he failed to see what he should have seen, i. e., defendants’ illuminated vehicle, and that his negligence was at least a contributory factor to the accident.
Our review of the testimony compels the same conclusions. Furthermore, the nature of the conflict in testimony necessarily required the trial court to consider the credibility of the witnesses. There was an ample evidentiary basis for the court to con- *367 elude that the defendant, Sandel, had used his flashers to warn approaching traffic; that the vehicle which blinked its headlamps was, indeed, stopped and engaged also in warning approaching traffic, and further that plaintiff simply breached his duty to observe the roadway ahead of him and failed to see and appreciate the hazardous conditions which existed. This negligence was the cause-in-fact of the accident. Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298, 299 (La.1962); Marcum v. United States, 621 F.2d 142 (5th Cir. 1980). We find no manifest error in the trial court’s decision. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979).
For the foregoing reasons, the judgment appealed from is, therefore, affirmed at appellant’s costs.
AFFIRMED ON REMAND.